**William LOLLAR, Plaintiff/Respondent,**

**v.**

**Jack P. MANESS, II, et al, Defendants/Appellants.**

**No. 53532.**

Missouri Court of Appeals, Eastern District, Division Two.

Feb. 21, 1989.

Dennis E. McIntosh, Farmington, for defendants/appellants.

Clinton B. Roberts, Farmington, for plaintiff/respondent.

GRIMM, Presiding Judge.

In this bench-tried action, defendants appeal from the trial court's judgment awarding plaintiff damages for the destruction of a fence and quieting title in plaintiff to property west of that fence. We affirm and remand.

Defendants raise three allegations of error. First, the trial court erred in quieting title in plaintiff, because this was an action to determine a boundary line and quieting title was an inappropriate remedy. We disagree, because defendants' denial of plaintiff's claim created a title controversy, and quiet title was an appropriate remedy. Second, the trial court erred in quieting title in plaintiff, because plaintiff failed to prove an unequivocal claim of right as an adverse possessor. We disagree, because we defer to the trial court's resolution of conflicting evidence, and there was substantial evidence to support the court's judgment. Third, the trial court's judgment describing the affected property is so indefinite as to be void and unenforceable. We disagree, because the description is determinable.

Plaintiff purchased the Southwest quarter of the Southwest quarter of Section 25, Township 31 North, Range Six East on January 9, 1975.

Plaintiff's land is immediately west of defendants'; defendants purchased their property in 1971. Their deed contains this description:

The Southeast quarter of the Southwest quarter of Section Twenty–Five (25) in Township Thirty-one (31) North of Range Six (6) East, containing Forty (40) acres, more or less. The land conveyed by this deed is *bounded* as follows, to-wit: *On the West by land of William Stevens;* on the South by land of William Stevens, on the East by land of Chas. Gipson and on the North by land of the parties of the First Part, containing 40 acres, more or less. Being the same real estate conveyed by Warranty Deed from Christopher Gipson and Nervy Gipson, husband

and wife to Walter Gipson (subject to the life estate of Christopher Gipson and Nervy Gipson, and the said Christopher Gipson and Nervy Gipson are now both deceased) which is recorded in Book 62 at Page 465 of the Madison County, Missouri Deed Records. (Emphasis added).

Defendants' west line was bounded by the "land of William Stevens." Stevens purchased his land from Letha Skaggs' father a number of years after 1942.

Letha Skaggs was born on her father's property in May, 1924, and lived there until December, 1942. She recalled that two fence lines ran north and south on the eastern side of that tract. Skaggs' father told her many times that the fence furthest east marked the boundary between his tract and the tract of land now owned by defendants. The other fence was set on her father's land, and Skaggs' father made a roadway between the two fence lines. He also used the property immediately west of the "boundary fence" for farming and haying. This "boundary fence" was "pretty close" to where the pipeline is now located.

The Skaggs–Stevens land, now owned by plaintiff, was purchased in 1973 by Bud Adams. When Adams purchased the property, his immediate predecessor in title pointed out a rusty "old hog wire, old barb wire fence" as the boundary line between that property and the property to the east owned by defendants. This "boundary fence" was fifteen to twenty feet west of a pipeline running north to south on defendants' tract. A second fence existed on Adams' property, "seventy-five to a hundred feet" west of this "boundary fence." Adams grew potatoes between these two fence lines as his predecessor had done. Defendants' property east of the "boundary fence" was "[grown] up in brush."

Adams sold this tract of land to plaintiff in 1975. At that time, he showed plaintiff the "boundary fence" and told him it was the property line between plaintiff and defendants. After selling it to plaintiff, Adams disked the land, including the area immediately west of the "boundary fence," for plaintiff. Adams observed a new fence being put up in the same location as the old "boundary fence."

Plaintiff had the property surveyed in 1975, while a crew of workers were constructing new fences on plaintiff's property. The surveyor told plaintiff that the old fence, which Adams had identified as the boundary line, appeared to have been there for many years.

Plaintiff's new fence, constructed in 1975, was approximately one-quarter mile long and "was put up in the same location" as the prior, old "boundary fence." In 1981, defendant Jack Maness told plaintiff that he did not think the fence marked the boundary line; and he wanted it removed. Plaintiff replied that he believed the fence correctly marked the boundary. Plaintiff warned him not to remove it without a court order.

In April, 1981, surveyor Stanley Layton, at defendants' request, surveyed defendants' land to determine defendants' boundary lines. Using government markers, Layton located the southeast quarter of the southwest quarter of section twenty-five in township thirty-one north of range six. He platted this as defendants' property. Layton did not attempt to determine the west line as that "bounded ... by land of William Stevens." In 1984, without notice to plaintiff, defendants tore down the fence.

Plaintiff sued for damages resulting from the destruction of the fence and for quiet title to the property west of that fence line. Following a bench trial, the trial court found that the fence "is the long established boundary line between the parties and that Plaintiff and his predecessors in title have had adverse possession of the property for over 60 years." The trial court awarded plaintiff $750.00 for the destruction of the fence, and quieted title to the property west of the fence line in plaintiff.

■ In their first point, defendants maintain that the trial court erred in quieting title in plaintiff. They contend that "this action was not a title controversy but rather an action to determine a boundary

line because each party acknowledged the title source and legal description of the other's ownership." Defendants assert that quieting title in plaintiff was, thus, inappropriate.

Defendants rely on the following language in *Roberts v. Harms,* 627 S.W.2d 924 (Mo.App.W.D.1982):

> A dispute in which each owner admits the title of the other but disagrees as to the physical location of the boundary is not a title controversy. The appropriate action for determination of a boundary line is a suit in ejectment.

*Id.* at 926–927. Defendants' reliance on *Roberts,* however, is misplaced.

The *Roberts* court noted that "[d]espite the caption of the case as a quiet title suit, the petition allegations framed no such case because each party acknowledged the title source and legal description of the other's ownership." *Id.* at 926. In the case before us there was no such mutual acknowledgement. Plaintiff alleged that he had title to his quarter/quarter section. Defendant specifically denied this allegation. Also, at trial, defendants contested plaintiff's evidence that he had acquired the property through adverse possession. Thus, a title controversy existed; and the quiet title action was appropriate. *See A. Charles Bussen Trust v. Kertz,* 723 S.W.2d 922, 927 (Mo.App.E.D.1987).

Moreover, in the present case, the trial court's judgment quieting title in plaintiff was based on specific findings of fact regarding the disputed adverse possession evidence. *Cf. Roberts,* 627 S.W.2d at 927. The findings were responsive to that part of the petition's prayer which sought a declaration that "Defendants have no right, claim, title, interest or demand in or to the property." Thus, quiet title was an appropriate remedy. Point denied.

■ In their second point, defendants contend that the trial court erroneously quieted title in plaintiff, because plaintiff failed to prove an unequivocal claim of right as an adverse possessor.

■ "[O]ur duty is to affirm the trial court's judgment unless there is no sub-

stantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law." *A. Charles Bussen Trust,* 723 S.W.2d at 927; *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). Defendants correctly point out that one claiming title to property by adverse possession must prove, inter alia, an unequivocal claim of right or ownership. *Teson v. Vasquez,* 561 S.W.2d 119, 127 (Mo.App.E.D.1977). Defendants assert that plaintiff repeatedly equivocated his claim of right.

Defendants first look to plaintiff's original petition wherein he plead that defendants were the owners of "The Southeast quarter of the Southwest quarter of Section 25, Township 31 North, Range Six East." Plaintiff's first amended petition set forth the description of defendants' property as reflected in their deed. This description was more restrictive. Defendants contend that this constituted plaintiff's equivocation of his claim of right.

As noted by the trial court in its findings of fact, *Johnson v. Identification, Inc.,* 716 S.W.2d 10 (Mo.App.W.D.1986) stated the rule that:

> "An abandoned pleading generally is not admissible in evidence unless the pleading contains an admission against interest of the pleader. Although such admissions are not binding on the party, they may be employed for impeachment and are to be weighed by the trier of fact as any other admission would be."

*Id.* at 13 (Citations omitted).

The trial court's findings reflect that it afforded this "admission" due weight in rendering its judgment. Also, we note that defendants' answer to plaintiff's first amended petition admitted the veracity of the more restrictive description. Given the substantial evidence supporting the trial court's judgment, we find no error.

Defendants also contend that the equivocal nature of plaintiff's claim was demonstrated by his permissive use of the property. Defendants assert that plaintiff's use of the property was permissive because defendant Jack Maness "had 'verbally' permitted Lollar to fix up the fences and im-

prove the ground and to let Lollar use the property." Plaintiff testified that he repaired fences and improved the ground in exchange for the use of defendants' property, including a barn on the far eastern side of that property. The trial court could have reasonably inferred that plaintiff was referring to his use of the property east of the disputed fence line, and that he was not equivocating his claim of right to the property west of that fence line.

In arguing that plaintiff's use of the property was permissive, defendants also point to plaintiff's testimony that he performed the same improvements on defendants' land as he performed on the disputed property. Since the fence existed between the properties, and defendants and plaintiff had an agreement for plaintiff's use of the property east of that fence, the trial court could have reasonably found that this fact did not constitute plaintiff's equivocation of his claim to the disputed property.

Plaintiff testified that an application for money was made to the State in defendant Jack Maness' name, seeking reimbursement for the seeding and fertilizing of defendants' property. Plaintiff acknowledged that defendants gave him the reimbursement money in exchange for the work he completed. In the absence of further evidence on this matter, the trial court could reasonably have found that the State reimbursement was sought and received for improvements only to the property east of the disputed fence line.

Defendants further claim that plaintiff's use of the disputed land was permissive because plaintiff approached defendant Jack Maness before constructing a pond. Defendants state that plaintiff "suggested that the pond be placed in a natural basin where the disputed fence existed and at least a portion of the pond would have been on [defendants'] property which is clearly east of the disputed fence line." Plaintiff testified that the disputed fence line would have run directly through the proposed pond. From this evidence, the court could have reasonably concluded that plaintiff was not equivocating his claim of right to

the property west of the fence line; rather, he was merely recognizing defendant's right to the property east of that line.

Defendants next point to plaintiff's conversation with Riley, his surveyor. On cross-examination, plaintiff testified he asked Riley to determine exactly where the boundaries were located. He also told Riley that he did not want any of defendants' land. Riley informed him that defendants had what their deed called for, or close to it.

Defendants contend that plaintiff's testimony is "nearly identical" to that set forth in *Bell v. Barrett,* 76 S.W.2d 394, 395–396 (Mo.1934). The defendants in *Bell* asserted that the testimony of their predecessor in interest established their claim of adverse possession. However, the witness testified that he had not intended to claim more acreage than his deed described; and he had claimed only the property to the "true line." *Id.* Later, when the witness was recalled, he stated he had claimed the property up to a lane, without regard to the "true line." *Id.*

The Supreme Court concluded that this testimony did not establish adverse possession as a matter of law. The *Bell* court, deferring to the trial court's determination of credibility and resolution of ambiguity, found substantial evidence to support the trial court's findings that defendants' claim of right was equivocal, and their claim of adverse possession had not been established.

Here, plaintiff did state that he had hired Riley to determine the boundaries of his property, and also had asked him to confirm that defendants had the property described in their deed. To the extent these statements express plaintiff's concern for the "true line," and, thus, his equivocation, they are contradicted by his subsequent actions. Plaintiff testified that he constructed the new fence along the old fence line when Riley showed him the old fence and told him that defendants had "close" to what their deed described.

Plaintiff's concern for the "true line" was, thus, questionable. At most, his testimony raised the issue of equivocation.

Like the *Bell* court, we defer to the trial court's determination of credibility and its resolution of ambiguity.

Additionally, contrary to defendants' assertion, plaintiff's statement that he did not want any of defendants' property is not fatal to his claim of adverse possession. It is well settled that an adverse possessor's claim is hostile "where the party occupies the land in question intending to occupy it as his own." *A. Charles Bussen Trust,* 723 S.W.2d at 929. "Ignorance of the boundary line is irrelevant as an intent to take away from the true owner is not necessary." *Id.*

■ In their final point, defendants assert that the trial court's order quieting title in plaintiff "is so indefinite as to be void and unenforceable." Specifically, defendants point to the portion of the trial court's judgment which vests title in plaintiff to the property described in the petition, including "all land located west of the 'Lollar fence line' as shown on the plat of Stanley Layton, surveyor."

The trial court's description of the property line is insufficient, but it is not so indefinite as to be void and unenforceable. A description specifying, by metes and bounds, the location of the "Lollar fence line" can be determined. Therefore, we affirm the trial court's judgment quieting title to the property west of the "Lollar fence line" in plaintiff. The cause, however, is remanded; and the trial court is directed to take the steps necessary to locate, by metes and bounds, the "Lollar fence line" in conformity with its previous findings.

The judgment of the trial court is affirmed and the cause is remanded.

KAROHL and GARY M. GAERTNER, JJ., concur.